UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
Joshua Diaz, Individually and on behalf of all others similarly situated,

Plaintiff,

-against-

The Gap, Inc., Sonia Syngal, and Katrina O'Connell,

Defendants.
---------------------------------------------------------------X

**MEMORANDUM & ORDER**
22-CV-07371 (DG) (JAM)

DIANE GUJARATI, United States District Judge:

On December 5, 2022, Joshua Diaz commenced this action asserting claims pursuant to the Securities Exchange Act of 1934 (the "Exchange Act"). *See* ECF No. 1. By Order dated April 7, 2023, Michael Smith was appointed lead plaintiff. *See* ECF No. 23. On July 20, 2023, Lead Plaintiff Smith and named Plaintiff Jeffrey Williams (together, "Plaintiffs") filed the operative Second Amended Class Action Complaint (the "Second Amended Complaint") against Defendants The Gap, Inc. ("Gap" or the "Company"), Sonia Syngal, the Company's Chief Executive Officer from March 2020 until July 2022, and Katrina O'Connell, the Company's Chief Financial Officer since March 2020 (together with Defendant Syngal, the "Individual Defendants," and collectively with Defendant Syngal and Gap, "Defendants"). *See generally* Second Amended Complaint ("SAC"), ECF No. 27. In substance and in summary, Plaintiffs allege that Defendants concealed the risks and failures of BODEQUALITY, a size-inclusivity initiative, and as a result, investors purchased stock in Gap at inflated prices and suffered losses when the truth came to light. *See generally* SAC.

The Second Amended Complaint is brought in two Counts. Count I asserts violations of Section 10(b) of the Exchange Act ("Section 10(b)") and U.S. Securities and Exchange

Commission ("SEC") Rule 10b-5 ("Rule 10b-5") against all Defendants. *See* SAC ¶¶ 128-37. Count II asserts violations of Section 20(a) of the Exchange Act ("Section 20(a)") against the Individual Defendants. *See* SAC ¶¶ 138-42.

Plaintiffs assert that they bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than Defendants who acquired Gap securities publicly traded on the New York Stock Exchange ("NYSE") during the Class Period (defined as November 24, 2021 through July 11, 2022) and who were damaged thereby (the "Class"). *See* SAC ¶¶ 1, 119.[1]

Plaintiffs seek, *inter alia*, damages against all Defendants, jointly and severally. *See* SAC at 49.

Pending before the Court is Defendants' Motion to Dismiss brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* Defendants' Notice of Motion to Dismiss, ECF No. 35; Declaration of Israel Dahan in Support of Defendants' Motion to Dismiss ("Dahan Declaration"), ECF No. 36;[2] Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss ("Defs. Br."), ECF No. 37; Defendants' Reply in Support of Defendants' Motion to Dismiss ("Defs. Reply"), ECF No. 39; Defendants' letter providing supplemental authority, ECF No. 40. Plaintiffs oppose Defendants' Motion to Dismiss. *See* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Pls. Br."), ECF No. 38.

For the reasons set forth below, Defendants' Motion to Dismiss is granted and the Second Amended Complaint is dismissed.

---

[1] Plaintiffs specify certain exclusions from the Class. *See* SAC ¶ 119.

[2] Together with the Dahan Declaration, Defendants submitted twelve exhibits. *See* ECF Nos. 36-1 to 36-12.

# BACKGROUND

## I. Factual Background[3]

### A. Defendant Gap

As alleged in the Second Amended Complaint, Gap operates as a global apparel retail company that offers apparel, accessories, and personal care products for men, women, and children under the Old Navy, Gap, Banana Republic, and Athleta brands; Gap is incorporated in Delaware and its head office is located at Two Folsom Street, San Francisco, California, 94105; and Gap's common stock trades on the NYSE under the ticker symbol "GPS." *See* SAC ¶¶ 12-13. Plaintiffs allege that in fiscal year 2020, Old Navy accounted for $7.536 billion in net sales, the Gap brand accounted for $3.388 billion, Banana Republic accounted for $1.462 billion, and other brands owned by the Company accounted for $1.414 billion. *See* SAC ¶ 27.

### B. Individual Defendants

As alleged in the Second Amended Complaint, Defendant Syngal served as Gap's Chief Executive Officer ("CEO") from March 2020 until July 2022 and served as President and CEO of Old Navy from April 2016 to March 2020. *See* SAC ¶¶ 14, 28.

As alleged in the Second Amended Complaint, Defendant O'Connell has served as Gap's Chief Financial Officer ("CFO") since March 2020; served as CFO and Senior Vice President of Strategy & Innovation at Old Navy from January 2017 to March 23, 2020; and served as CFO and Senior Vice President of Strategy, Banana Republic from March 2015 to January 2017. *See*

---

[3] The following facts are taken from the Second Amended Complaint and are accepted as true for purposes of the instant Motion. The Court has considered all of the allegations in the Second Amended Complaint, including those not expressly referenced herein.

The Second Amended Complaint contains bolded and italicized phrases. When quoting allegations contained in the Second Amended Complaint, the Court retains the bolded and italicized formatting.

SAC ¶ 15. Plaintiffs allege that Defendant Syngal brought Defendant O'Connell with her to Gap's C-suite, explaining in a March 12, 2020 press release that Defendant O'Connell had "strong operating capabilities from her time leading inventory management" and noting that she was "a partner in leading Old Navy over the past three years." *See* SAC ¶ 28.

### C. Former Employees

The Second Amended Complaint references and relies on the accounts and statements of five former employees of the Company.

Plaintiffs allege that Former Employee 1 ("FE-1") was employed at Old Navy from June 2017 to March 2023 and held the following roles: "Global Merchant for Plus from September 19;" "Customer Lead (for BODEQUALITY) from February 2020 until March 2022;" "Senior Merchant Women's Active beginning in December 2021 until May 2022;" and "Merchandising Lead, Family Matching from approximately May 2022 or June 2022 until FE-1 left the company in March 2023." *See* SAC ¶ 22.

Plaintiffs allege that Former Employee 2 ("FE-2") was "a District Manager of Old Navy in Northern Virginia from 2019 until 2022" and was with Old Navy at the launch of BODEQUALITY. *See* SAC ¶ 23. Plaintiffs allege that "FE-2 reported to a Senior Director who reported to SVP Head of Stores John Denton," who reported to Nancy Green ("Green"). *See* SAC ¶ 23.[4] Plaintiffs further allege that FE-2 was responsible for the sales and marketing for the stores in FE-2's district and payroll, hiring, training, reviews, and audits. *See* SAC ¶ 23.

Plaintiffs allege that Former Employee 3 ("FE-3") was "an Assistant General Manager of

---

[4] As alleged in the Second Amended Complaint, Green was President of Old Navy from August 2019 to February 2020, was President and Interim CEO of Old Navy from March 2020 to September 2020, and was President and CEO of Old Navy from October 2020 to May 2022. *See* SAC ¶ 21.

Merchandising for an Old Navy store from 2018 until 2022." *See* SAC ¶ 24. Plaintiffs further allege that FE-3 was responsible for Women's Merchandising and oversaw other departments. *See* SAC ¶ 24.

Plaintiffs allege that Former Employee 4 ("FE-4") was "an Old Navy District Manager in Northern California from June 2019 to January 1, 2022" and "oversaw stores in Sacramento, Chico, Redding, Eureka, Roseville, among other northern CA towns." *See* SAC ¶ 25. Plaintiffs allege that "FE-4's region included Sacramento north to Eureka, CA." *See* SAC ¶ 25. Plaintiffs further allege that FE-4 said the number of retail stores in this region varied during FE-4's tenure, starting as 12 stores and increasing to 17 stores by the time FE-4 left the company. *See* SAC ¶ 25. Plaintiffs allege that FE-4 reported to a Senior Regional Manager who reported to Territory Manager John Hauser ("Hauser"), who reported to Green. *See* SAC ¶ 25.

Plaintiffs allege that Former Employee 5 ("FE-5") was "an Old Navy District Manager in the Inland Empire area of California from 2019 until April or May 2022" and oversaw all the general managers for the stores in the district. *See* SAC ¶ 26. Plaintiffs further allege that "FE-5 was responsible for approximately 13 stores in the Inland Empire, which included retail stores in Barstow, Temecula, Palm Desert, Rialto, Moreno Valley, and others." *See* SAC ¶ 26. Plaintiffs allege that FE-5 oversaw the launch of BODEQUALITY at the stores in the district when that time came. *See* SAC ¶ 26. Plaintiffs further allege that FE-5 said one of FE-5's stores also participated in an early test of the BODEQUALITY initiative. *See* SAC ¶ 26. Plaintiffs allege that "FE-5 reported to Regional Manager Danielle Zingler who reported to Territory VP Hauser." *See* SAC ¶ 26. Plaintiffs further allege that Hauser reported to Steve Sickle until Sickle retired in the fall of 2021 and that FE-5 believed Hauser then reported directly to Green until Sickle's replacement was found. *See* SAC ¶ 26.

### D. Relevant Events

#### 1. Old Navy Launches BODEQUALITY

Plaintiffs allege that BODEQUALITY is a "size-inclusivity campaign which eliminated Old Navy's traditional division of clothes into standard and plus sizes, and introduced a system of selling every item, in every style, in every size, from zero to thirty." *See* SAC ¶ 31. Plaintiffs allege that according to FE-4, to make all styles available in all sizes and expand the number of sizes the stores carried, Old Navy decreased the amount of inventory in sizes 0 to 12 – for example, if a store stocked 24 units of a specific style across all sizes from 0 to 18, then with BODEQUALITY that store carried the same number of total units but spread across additional sizes. *See* SAC ¶ 37.

Plaintiffs allege that according to FE-1, FE-1 first heard about the concept that eventually became BODEQUALITY in September of 2019. *See* SAC ¶ 33. Plaintiffs further allege that by October of 2019, Old Navy began rolling out its new BODEQUALITY line in select stores, starting with one store for a three-week period and 75 stores for a six-week period. *See* SAC ¶ 33. Plaintiffs allege that this was supposed to produce statistically significant data to determine whether and how to proceed with a full-scale rollout to all retail stores. *See* SAC ¶ 33. Plaintiffs allege that according to FE-1, the Old Navy Testing Team selected the stores that would participate in the testing and also analyzed the results of the testing. *See* SAC ¶ 33. Plaintiffs allege that the data was then provided to outside consultants. *See* SAC ¶ 33.

Plaintiffs allege that according to FE-1, in February 2020, Gap announced internally the BODEQUALITY initiative and on August 20, 2021, Old Navy launched BODEQUALITY. *See* SAC ¶ 34. Plaintiffs further allege that Old Navy disclosed BODEQUALITY publicly on August 18, 2021. *See* SAC ¶ 34.

### 2. Issues with BODEQUALITY

Plaintiffs allege that almost immediately, the BODEQUALITY program encountered problems. *See* SAC ¶ 38. Plaintiffs point to a May 20, 2022 *Wall Street Journal* article titled "Old Navy Made Clothing Sizes for Everyone. It Backfired" in alleging that BODEQUALITY encountered problems almost immediately. *See* SAC ¶ 38 (quoting from and discussing article); *see also* SAC ¶ 53. Plaintiffs allege that this article stated, *inter alia*, that "[s]tores were selling out of the middle sizes and were stuck with piles of very small and very large sizes." *See* SAC ¶ 38. And Plaintiffs allege that FE-2 observed the same thing happening at the store level. *See* SAC ¶ 38. Plaintiffs allege that according to FE-2, it became "apparent 'immediately' that Old Navy had insufficient quantities of mid-sized items and too many small and large items – that is, an excess of unsold inventory." *See* SAC ¶ 38. Plaintiffs allege that according to FE-2, within two weeks of launching BODEQUALITY, stores in FE-2's region sold out of mid-sizes and had a glut of the largest sizes and the reason they faced such immediate shortages is that, given that the capacity of Old Navy stores did not change, stocking more larger size items required stocking fewer of their more popular medium sizes. *See* SAC ¶ 39. Plaintiffs further allege that the stores FE-2 supervised showed the 2X, 3X, and 4X sizes remaining and that "[v]isually it was especially obvious with the dresses and pants because they are longer and noticeable for that reason." *See* SAC ¶ 39.

Plaintiffs allege that FE-3 also noticed an abundance of plus sizes after the launch of BODEQUALITY and saw repeated markdowns to move inventory, which impacted margins. *See* SAC ¶ 39. Plaintiffs allege that FE-2 also observed that Old Navy heavily discounted plus size items and that "[s]hortly after implementing BODEQUALITY, the stores FE-2 managed had clearance sections full of the Plus sizes (2X, 3X and 4X), which was easy to see because items

were grouped by size." *See* SAC ¶ 40.

Plaintiffs allege that according to FE-4, within three or four weeks of the launch of BODEQUALITY in August 2021, there was an abundance of plus sizes in stock. *See* SAC ¶ 41. Plaintiffs further allege that according to FE-4, in addition to finding that certain sizes were out of stock at the stores FE-4 was responsible for, it appeared that the problems extended beyond FE-4's stores; that when certain sizes ran out at a particular retail store, employees had devices in the retail store that they could use to find if the sizes were available online or at other stores; and that when attempting to do this after the launch of BODEQUALITY, they could not find the depleted sizes elsewhere. *See* SAC ¶ 41. Plaintiffs also allege that according to FE-4, FE-4 began sending communications about this to the Regional Visual Manager and the Regional Manager. *See* SAC ¶ 41. Plaintiffs allege that according to FE-4, this was already a serious problem by the fourth week after BODEQUALITY was introduced and that while Old Navy stores receive freight orders up to four times a week to replenish stock, the replenishments did not have the mid sizes that they needed. *See* SAC ¶ 41. Plaintiffs allege that according to FE-4, these shortages coincided with poorer sales performance in stores. *See* SAC ¶ 42.[5] Plaintiffs allege that according to FE-4, because FE-4's bonus was based on the performance of stores FE-4 supervised, FE-4 tracked sales closely. *See* SAC ¶ 43.

Plaintiffs allege that FE-5 also reported inventory problems with BODEQUALITY. *See* SAC ¶ 50. Plaintiffs allege that FE-5 stated that one of the stores that FE-5 supervised was selected for the initial BODEQUALITY test, which lasted approximately four months and started in November 2020. *See* SAC ¶ 50. Plaintiffs allege that "[s]oon after the launch of the

[5] Plaintiffs allege that "[t]he stores in FE-4's district typically had a 52 percent conversion, that is – if 100 people entered the store, 52 made a purchase" and that according to FE-4, with the advent of BODEQUALITY, conversion declined to 42 percent. *See* SAC ¶ 42.

BODEQUALITY test, many 3XL and 4XL items were on clearance, with the store inundated with inventory they could not sell." *See* SAC ¶ 50. Plaintiffs allege that FE-5 recalls that the nationwide BODEQUALITY roll out began in August 2021 and that there was excess 3XL and 4XL clothing that needed to go into clearance. *See* SAC ¶ 51. Plaintiffs allege that mid sizes sold out quickly, leading to issues with replenishment and that while typically stores can expect replenishment of popular items and sizes, FE-5 reported that small, medium, and large sizes were unavailable. *See* SAC ¶ 51.

Plaintiffs allege that FE-5 explained that "the regional manager that FE-5 reported to held weekly meetings with all District Managers under the Regional manager's supervision, which numbered approximately eight District Managers," that the meetings were held in person in a store in Mission Viejo, and that FE-5 reported that "the District Managers in that region frequently brought up product allocation issues regularly after the BODEQUALITY launch." *See* SAC ¶ 52.

### 3. The "Jet Trip"

Plaintiffs allege that according to FE-4, in 2021, certain executives, including Defendant Syngal and Green, visited two stores in the Sacramento metro area on a "Jet Trip" (the "Jet Trip"). *See* SAC ¶¶ 45-46.[6] Plaintiffs allege that FE-4, then an Old Navy District Manager in

---

[6] Plaintiffs allege that according to FE-4, "it is typical for executives and a team of Planners (responsible for allocation) to have a 'Jet Trip' to visit actual retail stores immediately after Black Friday, typically in the first week of December." *See* SAC ¶ 45. Plaintiffs allege that according to FE-4, "the purpose of Jet Trips was to troubleshoot strategy for the next 10 days before Christmas;" that typically, Gap executives chose a geographic market for Jet Trips; and that "the team of executives visited two to three retail stores in that market, gathering feedback and commentary from stores' general managers and District Managers about operations and the focus for the holiday season." *See* SAC ¶ 45. Plaintiffs allege that according to FE-4, "Defendant Syngal, Green, the VP of human resources, and other executives" attended the Jet Trip and "visited the Roseville and Point West stores." *See* SAC ¶ 46.

Northern California, was unable to attend the meetings at the stores in the Sacramento area, and instead, FE-4 worked by phone with the individual store's general managers the evening before the visit, crafting talking points for the general managers to discuss with the visiting executives. *See* SAC ¶¶ 25, 47. Plaintiffs allege that FE-4 instructed the general managers on how the stores should appear physically and instructed the general managers "to address the 'size outs' – which referred to the lack of mid-sizes and abundance of Plus sizes." *See* SAC ¶ 47.

Plaintiffs allege that immediately after the visit, the two stores' general managers briefed FE-4, informing FE-4 that, initially, there was a lot of discussion about operations. *See* SAC ¶ 48. Plaintiffs allege that "[s]ince the stores had anemic Black Friday sales, however, FE-4 had encouraged the [general managers] to discuss the lack of size availability and the abundance of the Plus sizes." *See* SAC ¶ 48. Plaintiffs allege that according to FE-4, Defendant Syngal and Green asked the stores' general managers to show them examples of the glut in plus size inventory and the lack of mid-sized inventory. *See* SAC ¶ 48. Plaintiffs further allege that "[t]he general managers showed them a number of examples of different styles where there was almost no inventory in the size 4 through size 12 and approximately one size 0, one size 2, but plenty of inventory for the sizes above 12." *See* SAC ¶ 48. Plaintiffs allege that "[t]he general managers FE-4 told the GMs that the discussions about 'size outs' were fairly intense." *See* SAC ¶ 48.[7]

Plaintiffs allege that early the following Monday morning, after the Jet Trip, "all the district managers in FE-4's district received an email requesting that they physically count the number of each size for specific SKUs." *See* SAC ¶ 49. Plaintiffs further allege that according to FE-4, "corporate provided a spreadsheet in which general managers entered the figures,

[7] Here, there appears to be a typographical error in the Second Amended Complaint. Any error is not material to the Court's analysis or conclusions herein.

requiring completed data by email on a tight deadline," and that "the email requiring the inventory count arrived at 6 a.m., mandating turn around by 10 a.m. the same day." *See* SAC ¶ 49.

### 4. Gap Rolls Back BODEQUALITY

Plaintiffs allege that according to FE-1, by January 2022, Gap had decided to roll back Old Navy's BODEQUALITY program. *See* SAC ¶ 54. Plaintiffs allege that according to FE-1, after the launch of BODEQUALITY, Old Navy immediately analyzed data relating to BODEQUALITY on a weekly and monthly basis and that from the advent of BODEQUALITY, certain individuals at Old Navy, including Green, received the weekly and monthly inventory data analysis. *See* SAC ¶ 54.[8] Plaintiffs allege that according to FE-1, Green and her team planned to wait for three months of data before making any changes to BODEQUALITY and began reviewing this data by December of 2021 and January of 2022. *See* SAC ¶ 54. Plaintiffs further allege that in January of 2022, Gap made the decision to begin rolling back the extended size offering, initially removing them from 75 stores. *See* SAC ¶ 54. Plaintiffs allege that by February or March of 2022, Gap decided only to offer extended sizing online, not in stores, but did not[9] implement this change immediately. *See* SAC ¶ 54.

## E. Alleged Materially False and Misleading Statements

Plaintiffs allege that during the Class Period, Defendants made materially false and

---

[8] These individuals also included Old Navy Senior Vice President of Merchandising Andres Dorronsoro ("Dorronsoro"), Old Navy Global VP of Women's Merchandising, Alison Partridge Stickney ("Stickney"), and Old Navy VP of Inventory Management, Jaime Powers ("Powers"). *See* SAC ¶ 54.

[9] Plaintiffs represent that the Second Amended Complaint inadvertently omitted the word "not" from this sentence. *See* Pls. Br. at 6 n.2. The Court includes that word here for ease of readability and because it is evident that the omission was inadvertent.

misleading statements and omissions in Gap's press releases, earnings calls, and SEC filings – specifically, a November 23, 2021 press release; a November 23, 2021 earnings call; a Form 10-Q filed on November 24, 2021; a March 3, 2022 press release; a March 3, 2022 earnings call; and a Form 10-K filed on March 15, 2022. *See* SAC ¶¶ 55-91.[10] As detailed below, Plaintiffs allege that certain of the above-referenced press releases, earnings calls, and SEC filings incorporated certain earlier disclosure statements.

**1. November 23, 2021 Press Release**

Plaintiffs allege that on November 23, 2021, Gap issued a press release announcing its results for the third quarter ended October 30, 2021 (the "November 23, 2021 Press Release"), which stated in relevant part:

> **Old Navy:** Net sales were up 8% versus 2019. Comparable sales were down 9% year-over-year and increased 6% versus 2019. **Sales in the quarter outpaced available inventory as the brand was disproportionately impacted by supply chain delays, particularly within the women's assortment**.

*See* SAC ¶ 55.

Plaintiffs allege that this statement was materially misleading for omitting that Old Navy's failure to purchase their most popular sizes in sufficient quantities due to the launch of BODEQUALITY was a material cause of the shortfall of available inventory. *See* SAC ¶ 56.

---

[10] The Court has considered all of the alleged actionable statements contained in the Second Amended Complaint, including those statements – and portions of statements – not explicitly referenced herein.

As the parties appear to agree, the Second Amended Complaint erroneously alleges that a particular statement made by Defendant Syngal during the November 23, 2021 earnings call was also made during a March 3, 2022 earnings call. *See* Defs. Br. at 6 n.5; Pls. Br. at 10 n.3; *see also* SAC ¶ 81. In light of the error, the Court does not consider the allegation that the particular statement was also made during the March 3, 2022 earnings call. The Court considers the remainder of the allegations related to the March 3, 2022 earnings call.

Plaintiffs also allege that the November 23, 2021 Press Release incorporated by reference the following two risk factor disclosures in Gap's Annual Report on Form 10-K filed on March 16, 2021 (the "2020 Form 10-K"):

- *We must successfully gauge apparel trends and changing consumer preferences to succeed.*

  Our success is largely dependent upon our ability to gauge the tastes of our customers and to provide merchandise that satisfies customer demand in a timely manner. However, lead times for many of our design and purchasing decisions may make it more difficult for us to respond rapidly to new or changing apparel trends or consumer acceptance of our products. The global apparel retail business fluctuates according to changes in consumer preferences, dictated in part by apparel trends and season. **To the extent we misjudge the market for our merchandise** or the products suitable for local markets, or fail to execute trends and deliver products to the market as timely as our competitors, our sales will be adversely affected, **and the markdowns required to move the resulting excess inventory will adversely affect our operating results.**

*See* SAC ¶ 57. The Court hereinafter refers to this risk factor disclosure as the "Apparel Trends and Changing Consumer Preferences Risk Factor Disclosure."

- *If we are unable to manage our inventory effectively, our gross margins could be adversely affected.*

  Fluctuations in the global apparel retail markets impact the levels of inventory owned by apparel retailers. The nature of the global apparel retail business requires us to carry a significant amount of inventory, especially prior to the peak holiday selling season when we build up our inventory levels. Merchandise usually must be ordered well in advance of the season and frequently before apparel trends are confirmed by customer purchases. We must enter into contracts for the purchase and manufacture of merchandise well in advance of the applicable selling season. As a result, we are vulnerable to demand and pricing shifts and to suboptimal selection and timing of merchandise purchases. In the past, we have not always predicted our customers' preferences and acceptance levels of our trend items with accuracy. If sales do not meet expectations (for example, because of the continuing and unknown aggregate duration and impact of the COVID-19 pandemic on inventory supply and consumer demand), too much inventory may cause excessive markdowns and, therefore, lower-than-planned margins.

  We have key strategic initiatives designed to optimize our inventory levels and increase the efficiency and responsiveness of our supply chain, including

> vendor fabric platforming, product demand testing, and in-season rapid response to demand. **We are also developing additional capabilities to analyze customer behavior and demand, which we believe will allow us to better localize assortment and improve store-level allocations, such as size allocation, to further tailor our assortments to customer needs and increase sell-through. Further, we intend to leverage technology and data science to digitize product creation, integrate with our consolidated vendor base, and further optimize our product-to-market processes and supply chain to enhance our in-season responsiveness and reduce our exposure to fashion volatility. These initiatives and additional capabilities involve significant changes to our inventory management systems and processes. If we are unable to implement these initiatives and integrate these additional capabilities successfully, we may not realize the return on our investments that we anticipate, and our operating results could be adversely affected.**

*See* SAC ¶ 59. The Court hereinafter refers to this risk factor disclosure as the "Inventory Management Risk Factor Disclosure."

Plaintiffs allege that the Apparel Trends and Changing Consumer Preferences Risk Factor Disclosure was misleading because it omitted that this risk had already materialized. Plaintiffs allege that Gap "had already misjudged the market for their merchandise with the launch of BODEQUALITY, stocking an excess of plus size inventory and insufficient mid size inventory," and as a result, "Old Navy was already marking down excess plus size inventory, materially undermining sales." *See* SAC ¶ 58. Plaintiffs allege that the Inventory Management Risk Factor Disclosure was misleading because it omitted that this risk had already materialized. Plaintiffs allege that Gap "had already materially changed its size allocations through the implementation of BODEQUALITY at Old Navy;" that "[f]rom its tests at designated Old Navy stores, however, BODEQUALITY caused Old Navy to stock a glut of plus sizes and a dearth of far more popular mid sizes;" and that "at the time of this disclosure, Old Navy had already materially marked down excess plus size inventory, materially undermining sales." *See* SAC ¶ 60.

**2. November 23, 2021 Earnings Call**

Plaintiffs allege that on November 23, 2021, Gap held an earnings call (the "November 23, 2021 Earnings Call") during which Defendant Syngal stated in pertinent part:

> BODEQUALITY, Old Navy's inclusive sizing integration launched successfully in August. The brand more than doubled its extended size customer filed since launch. 15% of customers who shop extended sizes are new to the brand and more than a third have shopped Old Navy before that are new to the category. We are seeing strong extended size demand across fashion categories, a clear signal that our customer is craving trend choice lacking in the market.

*See* SAC ¶ 61.

Plaintiffs allege that Defendant Syngal's statement "was misleading for claiming that Old Navy was seeing 'strong extended size demand' and that this was 'a clear signal that our customer is craving trend choice lacking in the market' because, as a result of poor sales in extended sizes, Old Navy was conducting deeper than normal discounting, despite the fact that the retail sector as a whole was seeing less discounting than normal, as a result of the global supply chain crisis." *See* SAC ¶ 62.

Plaintiffs also allege that the November 23, 2021 Earnings Call incorporated by reference the Apparel Trends and Changing Consumer Preferences Risk Factor Disclosure and the Inventory Management Risk Factor Disclosure. *See* SAC ¶¶ 63, 65. Plaintiffs allege that the Apparel Trends and Changing Consumer Preferences Risk Factor Disclosure was misleading when incorporated by reference into the November 23, 2021 Earnings Call "because it failed to disclose that this risk had already materialized, in that Gap had already misjudged the market for their merchandise in the launch of BODEQUALITY, stocking an excess of plus size inventory and insufficient amounts of mid size inventory, and as a result was already marking down excess plus size inventory, hurting operating results." *See* SAC ¶ 64. Plaintiffs allege that the Inventory Management Risk Factor Disclosure was misleading when incorporated by reference into the

November 23, 2021 Earnings Call "because it failed to disclose that this risk had already materialized, in that Gap had already implemented changes to its size allocations through the implementation of BODEQUALITY, but that they were unable to implement that initiative successfully, stocking an excess of plus size inventory and insufficient amounts of mid size inventory, and as a result was already marking down excess plus size inventory, hurting operating results." *See* SAC ¶ 66.

**3. November 24, 2021 Form 10-Q**

Plaintiffs allege that on November 24, 2021, Gap filed with the SEC its periodic report on Form 10-Q for the quarter ended October 30, 2021 (the "November 24, 2021 Form 10-Q"); that Defendants Syngal and O'Connell signed the November 24, 2021 Form 10-Q; and that attached to the November 24, 2021 Form 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Syngal and O'Connell attesting to the accuracy of financial reporting, the disclosure of any material changes to Gap's internal control over financial reporting, and the disclosure of all fraud. *See* SAC ¶ 67.

Plaintiffs allege that with respect to risk factors, the November 24, 2021 Form 10-Q stated:

> There have been no material changes in our risk factors from those disclosed in Part I, Item 1A of our Annual Report on Form 10-K for the fiscal year ended January 30, 2021 [filed on March 16, 2021].

*See* SAC ¶ 68.

Plaintiffs allege that this statement was misleading for failing to disclose that the risks to Gap's inventory management substantially increased due to the launch of BODEQUALITY, and that by this time the risks had already come to fruition, as Old Navy was already engaged in deeper than normal discounting in order to clear excess inventory due to failed inventory

management in connection with BODEQUALITY. *See* SAC ¶ 69.

Plaintiffs further allege that this statement was misleading for failing to disclose that the risk factors disclosed in the Apparel Trends and Changing Consumer Preferences Risk Factor Disclosure and the Inventory Management Risk Factor Disclosure had, by the time of the filing of the November 24, 2021 Form 10-Q, already come to fruition. *See* SAC ¶¶ 70-74. Specifically, Plaintiffs allege that Defendants' statement that there were no material changes to the Apparel Trends and Changing Consumer Preferences Risk Factor was misleading "for failing to disclose that this risk had already materialized, in that Gap had already misjudged the market for their merchandise in the launch of BODEQUALITY, stocking an excess of plus size inventory and insufficient amounts of mid size inventory, and as a result was already marking down excess plus size inventory, hurting operating results." *See* SAC ¶ 72. Plaintiffs further allege that Defendants' statement that there were no material changes to the Inventory Management Risk Factor Disclosure was misleading "for failing to disclose that this risk had already materialized, in that Gap had already implemented changes to its size allocations through the implementation of BODEQUALITY, but that they were unable to implement that initiative successfully, stocking an excess of plus size inventory and insufficient amounts of mid size inventory, and as a result was already marking down excess plus size inventory, hurting operating results." *See* SAC ¶ 74.

**4. March 3, 2022 Press Release**

Plaintiffs allege that on March 3, 2022, Gap issued a press release announcing its financial results for the fourth quarter and fiscal year ended January 29, 2022 (the "March 3, 2022 Press Release"), which stated in relevant part:

> After two years of restructuring, including divesting smaller non-strategic brands, transitioning our European market to an asset-light partnership model and

> shedding underperforming North American stores, our core business is strong and we are poised for balanced growth across our four billion-dollar lifestyle brands . . . as our teams address near-term disruption from the acute headwinds that muted our fourth quarter performance, we are confident in our ability to execute against our long-term strategy, capitalizing on our investments in demand-generation, customer loyalty and artificial intelligence to accelerate profitable growth.
>
> * * *
>
> Old Navy: Fourth quarter net sales were muted in part due to supply chain impacts, up 2% versus 2019 with comparable sales flat versus 2019. For the year, the brand crossed $9 billion in net sales, up 14% compared to fiscal year 2019 with comparable sales up 12% versus 2019. Leaning into its market leadership in Active, Denim and Kids and Baby, Old Navy is well-positioned as a Value brand, offering the Democracy of Style for the whole family at jaw-dropping prices.

*See* SAC ¶ 75.

Plaintiffs allege that this statement was misleading for failing to disclose that Old Navy's disappointing performance was due to problems with BODEQUALITY – specifically that Old Navy had purchased the wrong distribution of sizes, with too many of the smallest and largest sizes and not enough of the most popular mid range sizes, leading to both product shortages in popular sizes and higher than normal discounting in the smallest and largest sizes. *See* SAC ¶ 76.

Plaintiffs also allege that the March 3, 2022 Press Release incorporated by reference the Apparel Trends and Changing Consumer Preferences Risk Factor Disclosure and the Inventory Management Risk Factor Disclosure. *See* SAC ¶¶ 77, 79. Plaintiffs allege that the Apparel Trends and Changing Consumer Preferences Risk Factor Disclosure was misleading when incorporated by reference into the March 3, 2022 Press Release "because it failed to disclose that this risk had already materialized, in that Gap had already misjudged the market for their merchandise in the launch of BODEQUALITY, stocking an excess of plus size inventory and insufficient amounts of mid size inventory, and as a result was already marking down excess plus size inventory, hurting operating results." *See* SAC ¶ 78. Plaintiffs allege that the Inventory

Management Risk Factor Disclosure was misleading when incorporated by reference into the March 3, 2022 Press Release because "it failed to disclose that this risk had already materialized, in that Gap had already implemented changes to its size allocations through the implementation of BODEQUALITY, but that they were unable to implement that initiative successfully, stocking an excess of plus size inventory and insufficient amounts of mid size inventory, and as a result was already marking down excess plus size inventory, hurting operating results." *See* SAC ¶ 80.

**5. March 3, 2022 Earnings Call**

Plaintiffs allege that on March 3, 2022, Gap held an earnings call (the "March 3, 2022 Earnings Call") and that the March 3, 2022 Earnings Call incorporated by reference the Apparel Trends and Changing Consumer Preferences Risk Factor Disclosure and the Inventory Management Risk Factor Disclosure. *See* SAC ¶¶ 81, 83, 85. Plaintiffs allege that the Apparel Trends and Changing Consumer Preferences Risk Factor Disclosure was misleading when incorporated by reference into the March 3, 2022 Earnings Call "because it failed to disclose that this risk had already materialized, in that Gap had already misjudged the market for their merchandise in the launch of BODEQUALITY, stocking an excess of plus size inventory and insufficient amounts of mid size inventory, and as a result was already marking down excess plus size inventory, hurting operating results." *See* SAC ¶ 84. Plaintiffs allege that the Inventory Management Risk Factor Disclosure was misleading when incorporated by reference into the March 3, 2022 Earnings Call "because it failed to disclose that this risk had already materialized, in that Gap had already implemented changes to its size allocations through the implementation of BODEQUALITY, but that they were unable to implement that initiative successfully, stocking an excess of plus size inventory and insufficient amounts of mid size inventory, and as a result was already marking down excess plus size inventory, hurting operating results." *See* SAC ¶ 86.

### 6. March 15, 2022 10-K

Plaintiffs allege that on March 15, 2022, Gap filed with the SEC its Annual Report on Form 10-K for the year ended January 29, 2022 (the "2021 Form 10-K"); that Defendants Syngal and O'Connell signed the 2021 Form 10-K; and that attached to the 2021 Form 10-K were certifications pursuant to SOX signed by Defendants Syngal and O'Connell attesting to the accuracy of financial reporting, the disclosure of any material changes to Gap's internal control over financial reporting, and the disclosure of all fraud. *See* SAC ¶ 87.

Plaintiffs allege that the 2021 Form 10-K provided the following two risk disclosure statements:

- *We must successfully gauge apparel trends and changing consumer preferences to succeed.*

  Our success is largely dependent upon our ability to gauge the tastes of our customers and to provide merchandise that satisfies customer demand in a timely manner. However, lead times for many of our design and purchasing decisions may make it more difficult for us to respond rapidly to new or changing apparel trends or consumer acceptance of our products, and supply chain disruptions may lead to prolonged delays in receiving inventory. The global apparel retail business fluctuates according to changes in consumer preferences, dictated in part by apparel trends and season. **To the extent we misjudge the market for our merchandise or the products suitable for local markets**, or fail to execute trends and deliver products to the market as timely as our competitors, **our sales will be adversely affected, and the markdowns required to move the resulting excess inventory will adversely affect our results of operations.**

- *If we are unable to manage our inventory effectively, our results of operations could be adversely affected.*

  Fluctuations in the global apparel retail markets impact the levels of inventory owned by apparel retailers. The nature of the global apparel retail business requires us to carry a significant amount of inventory, especially prior to the peak holiday selling season when we build up our inventory levels. Merchandise usually must be ordered well in advance of the season and frequently before apparel trends are confirmed by customer purchases. We must enter into contracts for the purchase and manufacture of merchandise well in advance of the applicable selling season, and supply chain delays may increase lead times. As a result, we are vulnerable to demand and pricing

> shifts and to suboptimal selection and timing of merchandise purchases. In the past, we have not always predicted our customers' preferences and acceptance levels of our trend items with accuracy. If sales do not meet expectations, including due to the impact of current economic conditions (including due to inflationary pressures, political instability or the impacts of the COVID-19 pandemic) on consumer demand, too much inventory may cause excessive markdowns and, therefore, lower-than-planned gross margins. Conversely, if we underestimate or are unable to satisfy consumer demand for our products, including due to increasing consumer demand in areas where the impacts of the COVID-19 pandemic decrease or supply chain disruptions that result in delayed inventory, we may experience inventory shortages, which could result in lower than anticipated sales, delayed shipments to customers and negative impacts on consumer relationships and brand loyalty, which could adversely affect our results of operations.
>
> We have key strategic initiatives designed to optimize our inventory levels and increase the efficiency and responsiveness of our supply chain, including vendor fabric platforming, product demand testing, and in-season rapid response to demand. **We are also developing additional capabilities to analyze customer behavior and demand, which we believe will allow us to better localize assortment and improve store-level allocations, such as size allocation, to further tailor our assortments to customer needs and increase sell-through. Further, we are leveraging technology and data science to digitize product creation, integrate with our consolidated vendor base, and further optimize our product-to-market processes and supply chain which we anticipate will enhance our in-season responsiveness and reduce our exposure to fashion volatility. These initiatives and additional capabilities involve significant changes to our inventory management systems and processes. If we are unable to implement these initiatives and integrate these additional capabilities successfully, we may not realize the return on our investments that we anticipate, and our results of operations could be adversely affected.**

*See* SAC ¶¶ 88, 90.

Plaintiffs allege that the first disclosure was misleading "because it failed to disclose that this risk had already materialized, in that Gap had already misjudged the market for their merchandise in the launch of BODEQUALITY, stocking an excess of plus size inventory and insufficient amounts of mid size inventory, and as a result was already marking down excess plus size inventory, hurting operating results." *See* SAC ¶ 89.

Plaintiffs allege that the second disclosure was misleading "because it failed to disclose that this risk had already materialized, in that Gap had already implemented changes to its size allocations through the implementation of BODEQUALITY, but that they had misjudged the market in their implementation of BODEQUALITY, stocking an excess of plus size inventory and insufficient amounts of mid size inventory, and as a result was already marking down excess plus size inventory, hurting operating results." *See* SAC ¶ 91.

**F. Allegations Related to Decrease in Stock Price**

Plaintiffs allege that on April 21, 2022, Gap issued a current report on Form 8-K that stated in pertinent part:

> Gap Inc. (NYSE: GPS) announced today that Old Navy President and CEO Nancy Green is exiting the Old Navy business this week.
>
> . . .
>
> In light of the macro-economic dynamics as well as the execution challenges at the Old Navy brand, the company is updating its first quarter fiscal 2022 net sales growth guidance to approximately low to mid-teens year-over-year declines from its prior guidance of mid to high single digit year-over-year declines. The company has also taken a more aggressive approach to assortment balancing resulting in increased promotional levels primarily at Old Navy. The company will be providing updated fiscal 2022 guidance when it reports first quarter fiscal 2022 results on Thursday, May 26.

*See* SAC ¶ 97.

Plaintiffs allege that "[o]n this news, Gap's stock price fell $2.57 per share, or 17%, to close at $11.72 per share on April 22, 2022, on unusually heavy trading volume, damaging investors." *See* SAC ¶ 98. Plaintiffs further allege that the announcement "of the termination of Nancy Green and the reduction in Old Navy's growth guidance was a materialization of the risk concealed by Defendants' false statements and material omissions regarding the risks of launching BODEQUALITY and the performance of BODEQUALITY." *See* SAC ¶ 99. The

Second Amended Complaint also includes allegations with respect to various analyst reports issued in response to this news. *See* SAC ¶¶ 100-03.

Plaintiffs point to the above-referenced May 20, 2022 *Wall Street Journal* article and allege that the article "reveal[ed] that the Company had improperly managed its inventory of plus size clothing at its Old Navy stores causing material declines in margins and business results," *see* SAC ¶ 104, and that "[o]n this news, the Company's stock [fell] 7% from closing at $11.19 per share on May 19, 2022 to closing at $10.33 per share on May 23, 2022, over the rest of trading May 20, 2022 and the next full trading day of May 23, 2022," *see* SAC ¶ 105. Plaintiffs allege that "[t]his partial corrective disclosure partially revealed the truth with respect to Defendants' false statements and omissions regarding BODEQUALITY." *See* SAC ¶ 105.

Plaintiffs allege that on May 27, 2022, Gap filed with the SEC a Form 10-Q for period ended April 30, 2022. *See* SAC ¶ 106. Plaintiffs allege that Defendants Syngal and O'Connell signed the May 27, 2022 Form 10-Q and certified as to its accuracy and that this Form 10-Q stated in relevant part:

> During the first quarter of fiscal 2022, our quarterly results were negatively impacted primarily by the continued global supply chain disruption, as well as product assortment and acceptance issues in key categories, largely at Old Navy, related to the post-COVID lifestyle consumer shift into occasion and work-based categories compared to the active and casual category preference last year. ***The quarterly results were also impacted by execution missteps in size and assortment at Old Navy related to BODEQUALITY, our extended size initiative launched in the third quarter of fiscal 2021.*** Global supply chain disruptions continued to affect our quarterly results due to difficulty managing the timing of seasonal inventory flows, and an inability to quickly react to changing consumer preferences. As a result, inventory levels are higher with an increase in extended-life basics and select seasonal basics being stored at distribution centers for expected introduction into the market in the second half of fiscal 2022 and first half of fiscal 2023. While we navigate these temporary headwinds, we remain focused on our key initiatives for our Power Plan strategy.

*See* SAC ¶ 106. Plaintiffs allege that "[o]n this news, Gap's stock price fell 6.5% over the

following two days trading days to close at $10.85 per share on June 1, 2022, further damaging investors." *See* SAC ¶ 107. Plaintiffs allege that "[t]his corrective disclosure partially revealed the truth with respect to Defendants' false statements and omissions regarding BODEQUALITY." *See* SAC ¶ 107.

Plaintiffs allege that on July 11, 2022, Gap announced that Defendant Syngal was stepping down from her position as President and CEO of the Company and resigning from the Board of Directors. *See* SAC ¶ 108. Plaintiffs allege that "[o]n this news, Gap's stock price fell 5% to close at $8.32 per share on July 12, 2022, further damaging investors." *See* SAC ¶ 109. Plaintiffs further allege that "[t]he announcement of the termination of Syngal was a materialization of the risk concealed by Defendants' false statements and material omissions regarding the risks of launching BODEQUALITY and the performance of BODEQUALITY." *See* SAC ¶ 109.

**G. Scienter-Related Allegations**

The Second Amended Complaint includes various allegations purporting to establish Defendants' scienter.

Plaintiffs assert that "[t]he fact that managing Old Navy's inventory was a core operation of the Gap supports a strong inference of scienter." *See* SAC ¶¶ 110, 115. Plaintiffs allege that Old Navy accounted for 54.6% of Gap's net sales in fiscal 2020, *see* SAC ¶¶ 110, 115; that Defendant Syngal described inventory management "as a 'core operating process' – stating, on November 23, 2021, that '[w]e've made significant progress digitizing core operating processes with a targeted focus on inventory management, loyalty and personalization,'" *see* SAC ¶¶ 29, 110, 115; and that Defendant O'Connell stated in an analyst call on June 4, 2021 that "[i]nventory is the foundation of our business, we need the right items in the right locations to

support demand or we will not win in the market." *See* SAC ¶¶ 30, 110, 115.

Plaintiffs further allege that Defendant O'Connell "was brought on as CFO of the Gap specifically because of her expertise at inventory management and her experience with Old Navy according to a March 12, 2020 Gap press release" and had "stressed the importance of inventory management" in a conference call dated April 9, 2020, *see* SAC ¶ 116; that Defendant Syngal "made it a priority to develop state of the art inventory monitoring systems that provided Syngal with detailed information regarding inventory levels at Old Navy" and that the "state of the art inventory management system allowed Syngal to receive regular updates regarding the status of Old Navy's inventory levels, and therefore to be aware that as a result of BODEQUALITY, Old Navy had excess inventory in large and small sizes and insufficient inventory in popular sizes in the middle," *see* SAC ¶ 111; that "as O'Connell explained, Gap senior executives were 'daily looking at inventory to make sure that we have a very conservative demand outlook,'" and that "[t]his daily monitoring of inventory levels" notified Defendants Syngal and O'Connell "of the inventory problems at Old Navy," *see* SAC ¶¶ 112, 117; that according to FE-1, "in the wake of the launch of BODEQUALITY, people involved with the implementation of it received weekly and monthly updates [and] [a]s CEO of Old Navy's parent company Syngal had access to this information," *see* SAC ¶ 113; and that two general managers informed Defendant Syngal during the Jet Trip that Old Navy was experiencing shortages in mid sizes and excess inventory in plus sizes, *see* SAC ¶114.

Plaintiffs assert that "Syngal and O'Connell's scienter can be attributed to the Gap." *See* SAC ¶ 118. Plaintiffs further assert that "the scienter of Green, Dorronsoro, Stickney, and Powers can be attributed to the Gap because they were senior officers of Old Navy, the Gap's largest subsidiary during the class period." *See* SAC ¶ 118. Plaintiffs allege that Green,

Dorronsoro, Stickney, and Powers "received weekly and monthly reports analyzing the performance of BODEQUALITY, reports that formed the basis of the Company's decision to terminate the BODEQUALITY initiative." *See* SAC ¶ 118. Plaintiffs also assert that further supporting Gap's scienter "is the fact that two general managers informed Green during the 'Jet Trip' shortly after Black Friday, 2021 that Old Navy was experiencing shortages in mid sizes and excess inventory in plus sizes." *See* SAC ¶ 118.

**II. Procedural Background**

On December 5, 2022, Joshua Diaz filed a Class Action Complaint alleging violations of Sections 10(b) and 20(a) of the Exchange Act. *See* ECF No. 1. By Memorandum and Order dated April 7, 2023, then-United States Magistrate Judge Ramon E. Reyes, Jr. granted Michael Smith's motion for appointment as lead plaintiff and for appointment of the Rosen Law Firm as lead counsel. *See* ECF No. 23.

On May 22, 2023, Plaintiffs filed an Amended Complaint. *See* ECF No. 24. On June 27, 2023, a stipulation was filed in which the parties agreed, *inter alia*, that Plaintiffs would file a Second Amended Complaint. *See* ECF No. 26 (stating that "subsequent to filing the Amended Complaint, Plaintiffs learned of new information that they seek to include" in a Second Amended Complaint). On July 20, 2023, Plaintiffs filed the Second Amended Complaint. *See* ECF No. 27; *see also* June 29, 2023 Order.

On September 5, 2023, Defendants filed a letter requesting a pre-motion conference in anticipation of filing a motion to dismiss, *see* ECF No. 28, and on September 12, 2023, Plaintiffs filed a letter in response to Defendants' request, *see* ECF No. 29 (stating, *inter alia*, that "Plaintiffs do not currently seek leave to amend but reserve the right to amend in response to any motion to dismiss"). On October 18, 2023, the Court held a pre-motion conference. *See* October

18, 2023 Minute Entry, ECF No. 30; Transcript of October 18, 2023 pre-motion conference, ECF No. 33.

On March 1, 2024, Defendants filed the instant Motion to Dismiss, which Plaintiffs oppose. *See* ECF Nos. 35, 36, 37, 38, 39. On April 16, 2024, Defendants filed a letter providing supplemental authority. *See* ECF No. 40.

**STANDARD OF REVIEW**

To survive dismissal for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ. of City Sch. Dist. of N.Y.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court must "accept all 'well-pleaded factual allegations' in the complaint as true" and "construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff." *Lynch v. City of N.Y.*, 952 F.3d 67, 74-75 (2d Cir. 2020) (first quoting *Iqbal*, 556 U.S. at 679; then quoting *Arar v. Ashcroft*, 585 F.3d 559, 567 (2d Cir. 2009)). However, "more than labels and conclusions" are required and "formulaic recitation[s] of the elements of a cause of action will not do." *See Twombly*, 550 U.S. at 555. Factual allegations "must be enough to raise a right to relief above the speculative level," and dismissal is proper where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *See id.* at 558. A court is not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *See Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quotation omitted); *see also Iqbal*, 556 U.S. at 678 (noting that a court is

"not bound to accept as true a legal conclusion couched as a factual allegation" (quoting *Twombly*, 550 U.S. at 555)); *Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010) (noting that "factual allegations must be sufficient to support necessary legal conclusions"). "In considering a motion to dismiss for failure to state a claim, '[a] district court is normally required to look only to the allegations on the face of the complaint,'" though "[it] may consider documents that 'are attached to the complaint,' 'incorporated in it by reference,' 'integral' to the complaint, or the proper subject of judicial notice." *United States v. Strock*, 982 F.3d 51, 63 (2d Cir. 2020) (quoting *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)).

A complaint alleging securities fraud must also satisfy the heightened pleading requirements set forth in Rule 9(b) of the Federal Rules of Civil Procedure and the PSLRA, 15 U.S.C. § 78u-4(b). *See Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012). Under Rule 9(b), a plaintiff alleging fraud "must state with particularity the circumstances constituting fraud." *See* Fed. R. Civ. P. 9(b). To satisfy this requirement, "a plaintiff must: '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 167 (2d Cir. 2021) (quoting *Anschutz*, 690 F.3d at 108). "The PSLRA expanded on the Rule 9(b) standard, requiring that 'securities fraud complaints specify each misleading statement; that they set forth the facts on which a belief that a statement is misleading was formed; and that they state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Anschutz*, 690 F.3d at 108 (alteration accepted) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005)); *see also* 15 U.S.C. § 78u-4(b)(1), (2).

"Rule 9(b) requires that 'in a case involving multiple defendants, plaintiffs must plead

circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible.'" *Greco v. Qudian Inc.*, No. 20-CV-00577, 2022 WL 4226022, at *25 (S.D.N.Y. Sept. 13, 2022) (alteration accepted) (quoting *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009)).

**DISCUSSION**

For the reasons set forth below, Defendants' Motion to Dismiss is granted and the Second Amended Complaint is dismissed in its entirety.

## I. Count I is Dismissed for Failure to State a Claim

As set forth below, Plaintiffs have failed to adequately plead that any Defendant made an actionable misstatement or omission and have failed to adequately plead scienter. Accordingly, Count I must be dismissed for failure to state a claim under Section 10(b) and Rule 10b-5.

### A. Applicable Law

Section 10(b) provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange -- [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (footnote omitted).

Rule 10b-5 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,

> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

"To state a claim for securities fraud under these provisions a plaintiff must allege that each defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d at 167 (quotation omitted).[11]

"[T]o be actionable under Section 10(b) and Rule 10b-5, the alleged misstatement or omission must be material." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 572 (S.D.N.Y. 2014) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)), *aff'd*, 604 F. App'x 62 (2d Cir. 2015). "At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000) (citing *Basic*, 485 U.S. at 231). Assessing materiality is "a fact-specific inquiry." *See ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.* ("*ECA*"), 553 F.3d 187, 197 (2d Cir. 2009). Moreover, "[a] violation of Section 10(b) and Rule 10b-5 premised on

---

[11] Here, Defendants challenge Count I on the grounds that the Second Amended Complaint does not adequately plead a materially false or misleading statement, fails to raise a strong inference of scienter, and fails to sufficiently allege loss causation. *See generally* Defs. Br.

Defendants argue more generally that the instant action "represents exactly the type of abusive securities suit that the [PSLRA] is meant to deter." *See* Defs. Br. at 1.

misstatements cannot occur unless an alleged material misstatement was false *at the time it was made*." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 571 (citing *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 812-13 (2d Cir. 1996)). "A statement believed to be true when made, but later shown to be false, is insufficient." *Id.* "Falsity is a failure to be truthful – it is not a misapprehension, misunderstanding, or mistake of fact at the time a statement was made." *Id.* (alteration accepted) (quotation omitted). The United States Court of Appeals for the Second Circuit "has repeatedly stated that plaintiffs must do more than simply assert that a statement is false – 'they must demonstrate with specificity why that is so.'" *Id.* (quoting *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004)).

Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information." *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). "Just because 'a reasonable investor would very much like to know a fact' does not create any obligation to speak up." *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 353 (2d Cir. 2022) (alteration accepted) (quoting *Dalberth v. Xerox Corp.*, 766 F.3d 172, 183 (2d Cir. 2014)). Rather, "[d]isclosure is necessary only if there is a duty to disclose or 'when necessary to make statements made, in the light of the circumstances under which they were made, not misleading.'" *Id.* (quoting *Kleinman v. Elan Corp.*, 706 F.3d 145, 153 (2d Cir. 2013)); *see also Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 264 (2024); *DeKalb Cnty. Pension Fund v. Allergan PLC*, No. 23-59, 2024 WL 677081, at *1 (2d Cir. Feb. 20, 2024). "[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Basic*, 485 U.S. at 231-32 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

"[E]xpressions of puffery and corporate optimism do not give rise to securities violations." *Rombach*, 355 F.3d at 174. Statements are considered expressions of puffery when they are "too general to cause a reasonable investor to rely upon them." *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (quoting *ECA*, 553 F.3d at 206).

To adequately plead scienter, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *See* 15 U.S.C. § 78u-4(b)(2)(A). "The requisite state of mind in a section 10(b) and Rule 10b-5 action is an intent 'to deceive, manipulate, or defraud.'" *ECA*, 553 F.3d at 198 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007)). "To qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. "The strength of an inference cannot be decided in a vacuum," and "[t]o determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323-24. "[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id.* at 326.

"The requisite scienter can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198.

"In order to raise a strong inference of scienter through 'motive and opportunity' to defraud," a plaintiff must allege that a defendant "'benefitted in some concrete and personal way from the purported fraud.'" *Id.* (quoting *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000)).

"General allegations that the defendants acted in their economic self-interest are not enough." *Ganino*, 228 F.3d at 170. "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry. Rather, the 'motive' showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." *ECA*, 553 F.3d at 198 (citations omitted).

As an alternative to establishing scienter through allegations regarding motive and opportunity, a plaintiff can "raise a strong inference of scienter under the 'strong circumstantial evidence' prong, 'though the strength of the circumstantial allegations must be correspondingly greater' if there is no motive." *See id.* at 198-99 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)). "Recklessness is sufficient to establish scienter only if the defendants' actions represent 'an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Gregory v. ProNAi Therapeutics Inc.*, 757 F. App'x 35, 37 (2d Cir. 2018) (quoting *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000)).

"At least four circumstances may give rise to a strong inference of the requisite scienter: where the complaint sufficiently alleges that the defendants (1) 'benefitted in a concrete and personal way from the purported fraud'; (2) 'engaged in deliberately illegal behavior'; (3) 'knew facts or had access to information suggesting that their public statements were not accurate'; or (4) 'failed to check information they had a duty to monitor.'" *ECA*, 553 F.3d at 199 (quoting *Novak*, 216 F.3d at 311). "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Novak*, 216 F.3d at 309; *see also Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531

F.3d 190, 196 (2d Cir. 2008) (rejecting plaintiff's argument that plaintiff had raised an inference of scienter by alleging that defendants failed to review or check information that they had a duty to monitor where plaintiff had "not specifically identified any reports or statements that would have come to light in a reasonable investigation and that would have demonstrated the falsity of the allegedly misleading statements"); *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 37 (S.D.N.Y. 2019) (stating that "Second Circuit cases uniformly rely on allegations that [1] *specific* contradictory information was available to the defendants [2] *at the same time* they made their misleading statements" and that "bare assertions that the defendants, due to their high-level positions in the Company, had access to adverse undisclosed financial information through internal corporate documents, meetings, and reports, without any further facts or details will not suffice to create a strong inference of scienter" (alteration accepted) (quotations omitted)).

"Where a defendant is a corporation," a plaintiff must "plead[] facts that give rise to a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (quotation omitted). "In exceedingly rare instances, a statement may be so dramatic that collective corporate scienter may be inferred." *Id.* at 99 (quotation omitted).

### B. Plaintiffs Have Failed to Allege an Actionable Misstatement or Omission

Count I of the Second Amended Complaint must be dismissed because Plaintiffs have failed to adequately plead an actionable misstatement or omission.

As set forth above, Plaintiffs allege in the Second Amended Complaint that various statements made by Defendants during the Class Period are actionable under Section 10(b) and Rule 10b-5. *See* SAC ¶¶ 55-91, 130. Plaintiffs argue that "Defendants' risk disclosures were

misleading for warning of inventory problems as hypothetical, when BODEQ[U]ALITY already caused those problems." *See* Pls. Br. at 7. More specifically, Plaintiffs argue that "Defendants repeated two misleading risk disclosures during the class period" – relating to apparel trends and changing consumer preferences and to inventory management, respectively. *See* Pls. Br. at 7-8.[12] Plaintiffs argue that these statements were misleading "for omitting that, when they were made, Old Navy was suffering from markdowns to move excess inventory, and misallocation of sizes due to the implementation of BODEQUALITY." *See* Pls. Br. at 8. Plaintiffs also argue that the November 23, 2021 Earnings Call statement that "[w]e are seeing strong extended size demand across fashion categories, a clear signal that our customer is craving trend choice lacking in the market" was misleading "because Old Navy experienced *weak demand* in leading to excess inventory in its extended size offerings." *See* Pls. Br. at 10. And Plaintiffs argue that the November 23, 2021 Press Release statement that at Old Navy, "[s]ales in the quarter outpaced available inventory as the brand was disproportionately impacted by supply chain delays, particularly within the women's assortment" and the March 3, 2022 Press Release statement that Old Navy's "[f]ourth quarter net sales were muted in part due to supply chain impacts, up 2% versus 2019 with comparable sales flat versus 2019" were misleading for two reasons: first, "as to extended sizes, sales did not outpace available inventory" and second, "sales in non-extended sizes outpaced available inventory not because of supply chain delays but because of the launch of BODEQUALITY." *See* Pls. Br. at 11.

Defendants argue, *inter alia*, that Plaintiffs have failed to plead any false or misleading

[12] As set forth above, the risk disclosures were contained in the 2020 Form 10-K; incorporated into the November 23, 2021 Press Release, November 23, 2021 Earnings Call, March 3, 2022 Press Release, and March 3, 2022 Earnings Call and referenced in the November 24, 2021 Form 10-Q; and repeated in substance in the 2021 Form 10-K.

statement. *See* Defs. Br. at 1, 7-8. More specifically, Defendants argue that nearly all of the statements challenged in the Second Amended Complaint are risk factor disclosures in Gap's SEC filings, which discuss general issues facing Gap as a retail company and make no mention of BODEQUALITY, *see* Defs. Br. at 1, 9-11; that the few non-risk factor statements challenged in the Second Amended Complaint are non-actionable because they are either immaterial puffery or statements for which Gap had no further disclosure obligation, *see* Defs. Br. at 1, 7-9; that Plaintiffs fail to allege particularized facts showing that *any* of the challenged statements were materially false or misleading at the time they were made, *see* Defs. Br. at 1, 11-24; and that "Plaintiffs' claims of fraud by a multi-billion-dollar retailer with thousands of stores across North America are premised on the anecdotal allegations of five rank-and-file former employees who are not alleged to have had contact with the Individual Defendants (or any senior executives at Gap or Old Navy)," *see* Defs. Br. at 1-2; *see also* Defs. Br. at 11-14 (arguing, *inter alia*, that "the only allegations of the purported materialization of the risk rely on hearsay from anonymous, low-level former employees and do not provide a particularized factual basis for the [Second Amended Complaint's] falsity claims").[13]

Here, Plaintiffs have failed to allege any actionable misstatement or omission. The statements at issue are not sufficiently alleged to be false and are not sufficiently alleged to be misleading.

---

[13] Defendants argue that "[a]t best, the former employees relied upon by the [Second Amended Complaint] collectively had insight into the operations of approximately 48 Old Navy stores in November 2021" and that "[a]s of January 30, 2021, there were 1,220 Old Navy stores in North America." *See* Defs. Br. at 12 (footnote omitted). Defendants argue that claims that there were widespread inventory and markdown issues connected to BODEQUALITY as of November 2021 are therefore based on the recollections of a handful of former employees alleged to have had insight into the operations of less than 4% of Old Navy stores in North America. *See* Defs. Br. at 12. The Court need not – and does not – rely on Defendants' assertion with respect to the number of Old Navy stores that existed as of January 30, 2021.

As an initial matter, the Second Amended Complaint does not plausibly allege that any alleged actionable statement was objectively false. *See generally* SAC. And, indeed, Plaintiffs appear to focus primarily on the assertion that the alleged actionable statements are materially misleading. *See, e.g.*, Pls. Br. at 7.

In the absence of allegations demonstrating that any alleged actionable statement was objectively false, the Court considers whether the alleged actionable statements were misleading. The Court concludes that they were not.

As set forth above, certain of the alleged actionable statements are risk factor disclosures. *See* SAC ¶¶ 57, 59, 63, 65, 68, 70, 71, 73, 77, 79, 83, 85, 88, 90. These risk factor disclosures, however, are not actionable. The risk factor disclosures are general discussions of risks that apply to Gap as a retail business, do not reference BODEQUALITY or Old Navy, and do not include specific data or metrics. The risk disclosures are not specific enough to mislead a reasonable investor. *See In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 267-68 (S.D.N.Y. 2023) (stating that "[c]ompanies issue risk disclosures all the time, disclosing that certain known risks may impact their performance or operations;" that "not every one of these risk disclosures necessarily implies that the event which could create a risk has not occurred to any extent;" that "[a] risk disclosure may be just what it purports to be – an identification by the issuer of the type of facts and events that could make the investment risky and not necessarily a representation one way or the other regarding whether the event has occurred to the extent that it presents a risk;" and that "the potential for the disclosure to mislead often turns on the specificity of the disclosure" – "[t]he more specific the caution, the closer it comes to an implied representation of fact and the more likely it is to mislead"); *In re Mylan N.V. Sec. Litig.*, No. 16-CV-07926, 2018 WL 1595985, at *9 (S.D.N.Y. Mar. 28, 2018) (stating that "the court must keep in mind" that the

test is whether a "reasonable investor could have been misled about the nature of the risk when he invested" (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002))).

The remaining statements also are not actionable. The November 23, 2021 Earnings Call statement that "[w]e are seeing strong extended size demand across fashion categories, a clear signal that our customer is craving trend choice lacking in the market," *see* SAC ¶ 61, expresses corporate optimism about customer demand – the statement is too general to cause a reasonable investor to rely on it. *See City of Pontiac Policemen's & Firemen's Ret. Sys.*, 752 F.3d at 183; *Rombach*, 355 F.3d at 174; *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *10. And the November 23, 2021 Press Release statement that at Old Navy, "[s]ales in the quarter outpaced available inventory as the brand was disproportionately impacted by supply chain delays, particularly within the women's assortment," *see* SAC ¶ 55, and the March 3, 2022 Press Release statement that Old Navy's "[f]ourth quarter net sales were muted in part due to supply chain impacts, up 2% versus 2019 with comparable sales flat versus 2019," *see* SAC ¶ 75, did not discuss BODEQUALITY and therefore did not give rise to a duty to disclose any alleged inventory problems associated with BODEQUALITY and whether any such alleged problems affected Old Navy's sales. *See Macquarie Infrastructure Corp.*, 601 U.S. at 264; *Matrixx Initiatives, Inc.*, 563 U.S. at 44-45; *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *4.[14]

Plaintiffs have failed to allege any actionable misstatement or omission and Count I must

---

[14] Plaintiffs have failed even to allege facts sufficient to demonstrate with particularity the existence of the alleged problems with BODEQUALITY – and, as set forth further below, have failed to allege facts sufficient to demonstrate that Defendants knew about the alleged problems when the statements at issue were made. Plaintiffs' reliance on general allegations of inventory problems and markdowns associated with BODEQUALITY and on the statements of former employees – none of whom is alleged to have been an executive at Gap or to have had knowledge of how Old Navy was operating as a whole – are insufficient here.

therefore be dismissed.[15]

**C. Plaintiffs Have Failed to Establish a Strong Inference of Scienter**

Count I of the Second Amended Complaint must also be dismissed for the additional reason that Plaintiffs have failed to adequately plead scienter with respect to any Defendant.

Plaintiffs argue that the Second Amended Complaint alleges a strong inference of scienter and Plaintiffs assert that the core operations doctrine, Defendants' monitoring of inventory, and the account of FE-4 support scienter and that the inference of scienter is as cogent and compelling as nonculpable inferences. *See* Pls. Br. at 16-23.

Defendants argue that the Second Amended Complaint fails to plead particularized facts giving rise to a strong inference of scienter. More specifically, Defendants argue, *inter alia*, that Plaintiffs do not allege a motive for fraud; that there are no allegations that speak to the state of mind of the Individual Defendants; that there are no allegations that show "what specific information the Defendants had at the time they made the challenged statements or the connection (temporal or otherwise) between that information and the statements at issue;" that no facts are alleged with particularity that give rise to a strong inference of scienter that is at least as compelling as the nonfraudulent inference in Defendants' favor – namely, "that Gap faced the usual challenges that companies face when trying to produce a wide range of sizes;" and that allegations that inventory management is a core operation of Gap do not raise a strong inference of scienter. *See* Defs. Br. at 1-2, 16-24.

**1. Motive and Opportunity**

In arguing that they have adequately pled scienter, Plaintiffs appear to rely principally on

---

[15] Even if one or more of the alleged misstatements or omissions could be deemed to be an actionable misstatement or omission, Count I nevertheless would be dismissed for failure to establish a strong inference of scienter, as discussed further below.

their assertion that they have adequately alleged strong circumstantial evidence of conscious misbehavior or recklessness, rather than on motive and opportunity. Indeed, the Second Amended Complaint does not allege facts sufficient to show that Defendants had the motive and opportunity to commit fraud. Plaintiffs do not allege, for example, any stock sales by the Individual Defendants or other facts demonstrating that the Individual Defendants benefitted in some concrete and personal way from the purported fraud.

To the extent that Plaintiffs point to allegations suggesting that Defendant Syngal wanted BODEQUALITY to succeed as evidence of motive and opportunity, *see* Pls. Br. at 22 (arguing that "Syngal, newly the CEO of Gap, staked her reputation on BODEQUALITY, taking credit for its origination and identifying it as a key driver of growth" and referring to BODEQUALITY as Defendant Syngal's "pet initiative" (citations omitted)), such allegations of generalized "motives possessed by virtually all corporate insiders" are insufficient to establish motive and opportunity. *See Novak*, 216 F.3d at 307 (noting that desire to sustain the appearance "of the success of an investment" is a "motive[] possessed by virtually all corporate insiders").

Plaintiffs have failed to sufficiently allege a strong inference of scienter through motive and opportunity.

**2. Circumstantial Evidence**

Assessed holistically, the allegations in the Second Amended Complaint do not demonstrate strong circumstantial evidence of conscious misbehavior or recklessness. Indeed, Plaintiffs' allegations fall far short of doing so.

Plaintiffs do not sufficiently allege that either Individual Defendant knew or had access to information contradicting public statements. The Second Amended Complaint fails to identify any specific reports or statements that were contradictory to the public statements – let alone

establish that either Individual Defendant received and/or reviewed any such reports or statements. Further, the allegations based on the account of FE-4 – *e.g.*, "that two general managers informed Syngal during the 'Jet Trip' shortly after Black Friday, 2021 that Old Navy was experiencing shortages in mid sizes and excess inventory in plus sizes," *see* SAC ¶ 114 – lack sufficient specificity to demonstrate that either Individual Defendant knew information contradicting public statements.[16] And Plaintiffs' allegation that Gap senior executives were looking at inventory daily, *see* SAC ¶¶ 112, 117, does not demonstrate that the Individual Defendants knew information contradicting public statements, notwithstanding the conclusory allegation that the daily monitoring of inventory levels "notified" the Individual Defendants of inventory problems at Old Navy, *see* SAC ¶¶ 112, 117. Plaintiffs' allegations fall far short of sufficiently alleging that either Individual Defendant knew or had access to information contradicting public statements. *See Novak*, 216 F.3d at 309 (stating that "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information"); *Dynex*, 531 F.3d at 196; *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 739 (S.D.N.Y. 2015) (stating that "[a]llegations premised on the testimony of confidential sources must show that individual defendants actually possessed the knowledge highlighting the falsity of public statements; conclusory statements that defendants were aware of certain information, and mere allegations that defendants would have or should have had such knowledge is insufficient" and finding the testimony of a confidential witness who claimed that defendants would often receive reports insufficient to support inference of scienter because the testimony "does not allege the content of the reports, the date of the reports, or whether [the

[16] Notably, the Second Amended Complaint does not allege that FE-4 – or any other FE – had direct discussions with or attended any meeting with either Individual Defendant.

defendants] ever read the reports" (quotations omitted) (collecting cases)); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 584.

Further, the Individual Defendants' statements that "[i]nventory is the foundation of our business," *see* SAC ¶ 110 (alleged O'Connell statement) and that Gap had "largely deployed the pipes that will allow us to use technology such as AI and machine learning to better optimize our inventory," *see* SAC ¶ 111 (alleged Syngal statement) do not themselves suggest that the Individual Defendants received information contradicting public statements.

And Plaintiffs' general allegations about Defendant Syngal's *ability* to receive/access information, *see* SAC ¶ 111 (alleging that Gap's inventory management system allowed Defendant Syngal "to receive regular updates regarding the status of Old Navy's inventory levels, and therefore to be aware that as a result of BODEQUALITY, Old Navy had excess inventory in large and small sizes, and insufficient inventory in popular sizes in the middle"); SAC ¶ 113 (alleging that "[a]s CEO of Old Navy's parent company Syngal had access to" weekly and monthly updates "regarding the performance of BODEQUALITY" "in the wake of the launch of BODEQUALITY"), are insufficient to demonstrate that either Individual Defendant knew or had access to information contradicting public statements. Not only does the Second Amended Complaint fall short of sufficiently alleging that Defendant Syngal accessed or otherwise received information contradicting public statements, the Second Amended Complaint also does not specify the *particulars* of any such information – and general, conclusory allegations do not suffice.

Nor do the allegations in the Second Amended Complaint sufficiently allege that either Individual Defendant acted recklessly. The allegations do not demonstrate that either Individual Defendant engaged in conduct that was highly unreasonable and that represented an extreme

departure from the standards of ordinary care. *See In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d at 39. And, as Defendants persuasively argue, Plaintiffs fail to account for more compelling inferences. *See* Defs. Reply at 9-10 (asserting that the allegations of conscious misbehavior or recklessness "are either generic 'must have known' claims or come from rank-and-file employees who are not alleged to have any personal knowledge of Defendants' state of mind" and arguing that "[t]hose allegations are not as compelling as the nonculpable inferences in Defendants['] favor, including that (a) Gap undertook a bold campaign that was ultimately unsuccessful, but not fraudulent, and (b) the BODEQUALITY launch was complicated by supply chain problems related to the COVID-19 pandemic").[17]

Plaintiffs' allegations that inventory management was a core operating process and that Old Navy, which accounted for 54.6% of Gap's net sales in fiscal 2020, was a core operation do not save Plaintiffs' scienter theory. Although the Second Circuit has not expressly determined whether the core operations doctrine survives as a viable theory of scienter following the enactment of the PSLRA, *see Frederick v. Mechel OAO*, 475 F. App'x 353, 356 & n.5 (2d Cir. 2012); *see also Swanson v. Danimer Sci., Inc.*, No. 23-7674-CV, 2024 WL 4315109, at *2 (2d Cir. Sept. 27, 2024), courts have held that the doctrine can provide supplemental support for allegations of scienter, even if it cannot establish scienter independently, *see City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 424 (S.D.N.Y. 2020) (collecting cases); *see also New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 n.3 (2d Cir. 2011). Here, Plaintiffs' allegations regarding core operations are insufficient

---

[17] Defendants assert that "while the SAC conveniently omits any discussion of how COVID-19 and supply chain disruptions affected Gap during the Class Period, the *Wall Street Journal* article [referenced in the Second Amended Complaint] explains that those factors 'complicated' the BODEQUALITY launch." *See* Defs. Br. at 5.

to establish any Defendant's scienter.

In addition, reliance on SOX certifications is unavailing, as Plaintiffs have failed to sufficiently allege either Individual Defendant's awareness of or recklessness to the allegedly materially misleading nature of the statements at issue. *See Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615 (S.D.N.Y. 2015) (stating that "[t]he plaintiff cannot raise an inference of fraudulent intent based on the signing of a certification without alleging any facts to show a concomitant awareness of or recklessness to the materially misleading nature of the statements"); *In re Turquoise Hill Res. Ltd. Sec. Litig.*, No. 13-CV-08846, 2014 WL 7176187, at *7 (S.D.N.Y. Dec. 16, 2014) (concluding that plaintiff's reliance on defendant's SOX certifications was unavailing, noting that plaintiff had not "offered any particularized allegation of an inference that the [SOX certifications] were not honestly and reasonably believed to be true when made" (alterations accepted) (quotation omitted)).

Plaintiffs have failed to allege strong circumstantial evidence of conscious misbehavior or recklessness sufficient to demonstrate scienter with respect to any Defendant.[18]

* * *

Plaintiffs have failed to adequately plead that any Defendant made an actionable

[18] Plaintiffs have failed to adequately plead corporate scienter. Plaintiffs do not plead facts that give rise to a strong inference that someone whose intent could be imputed to Gap acted with the requisite scienter. *See Dynex*, 531 F.3d at 195. As set forth above, Plaintiffs have failed to establish a strong inference of scienter as to either Individual Defendant. Further, the allegations in the Second Amended Complaint regarding unidentified Gap senior executives or other non-party Old Navy senior officers are not sufficiently particularized and do not establish any scienter that could be imputed to the Company. Nor do Plaintiffs allege any statement "so dramatic that collective corporate scienter may be inferred." *See Jackson*, 960 F.3d at 99 (quotation omitted).

misstatement or omission and have failed to adequately plead scienter.[19] Accordingly, Count I of the Second Amended Complaint is dismissed for failure to state a claim.[20]

## II. Count II is Dismissed for Failure to State a Claim

In light of the dismissal of Count I, Count II must be dismissed for failure to state a claim.

In Count II of the Second Amended Complaint, Plaintiffs bring claims under Section 20(a) of the Exchange Act, which provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

---

[19] Plaintiffs assert that Defendants violated their SEC disclosure obligations under Regulation S-K, 17 C.F.R. § 229.303 ("Item 303"). *See* SAC ¶¶ 92-95; Pls. Br. at 14-16. Any claim based on a violation of Item 303 fails here in light of Plaintiffs' failure to sufficiently allege scienter. *See In re Gen. Elec. Sec. Litig.*, 844 F. App'x 385, 387 (2d Cir. 2021).

[20] In light of the above, the Court need not – and does not – reach the issue of whether Plaintiffs have adequately pled loss causation. *See, e.g.*, *Hutchinson v. Perez*, No. 12-CV-01073, 2012 WL 5451258, at *8 (S.D.N.Y. Nov. 8, 2012) ("Since the Court must dismiss the Amended Complaint if Plaintiff fails to adequately plead scienter, I need not reach loss causation or misleading statements and omissions under the PSLRA."), *amended*, No. 12-CV-01073, 2013 WL 93171 (S.D.N.Y. Jan. 8, 2013).

In briefing, Defendants state: "Defendants reject any assertion that the SAC pleads scheme liability under Rule 10b-5(a) or (c) because Plaintiffs do not explain what the 'scheme' would be in this case. Plaintiffs cannot plausibly plead a claim simply by reciting the language of a statute. And to the extent that Plaintiffs claim otherwise, Defendants have moved to dismiss for failure to adequately allege scienter, which is also an element of any scheme claim under Rule 10b-5(a) and (c)." *See* Defs. Br. at 7 n.6 (referencing Paragraph 131 of the Second Amended Complaint). Defendants are correct that Plaintiffs' failure to establish scienter would be fatal to any such claim. *See Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021).

"To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

Because Plaintiffs have failed to adequately plead a primary violation of the Exchange Act, Count II of the Second Amended Complaint must be dismissed.

## III. Plaintiffs are Denied Leave to Further Amend

Here, dismissal is without leave to further amend given that the complaint has already been amended twice; that Plaintiffs were apprised of the pleading defects in the Second Amended Complaint by way of Defendants' request for a pre-motion conference, *see* ECF No. 28, and the pre-motion conference itself, *see* ECF No. 33; that Plaintiffs were further apprised of the pleading defects by way of Defendants' Motion to Dismiss, *see* ECF No. 35, and did not in response seek leave to amend, stating only in their opposition briefing that "if the motion is granted, plaintiffs seek leave to amend," *see* Pls. Br. at 25; that Plaintiffs have not identified in briefing any particular allegations Plaintiffs might add if granted leave to amend, *see generally* Pls. Br.; and that on the record before the Court, there is no indication that Plaintiffs could provide additional allegations that might cure the defects set forth above and lead to a different result. *See Gallop v. Cheney*, 642 F.3d 364, 369-70 (2d Cir. 2011); *Gregory*, 757 F. App'x at 39.

## CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss, ECF No. 35, is GRANTED and the Second Amended Complaint, ECF No. 27, is DISMISSED.

The Clerk of Court is directed to enter judgment and close the case.

SO ORDERED.

*/s/ Diane Gujarati*
DIANE GUJARATI
United States District Judge

Dated: March 31, 2025
Brooklyn, New York